(Slip Opinion) OCTOBER TERM, 2012 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CLAPPER, DIRECTOR OF NATIONAL INTELLIGENCE, ET AL. *v*. AMNESTY INTERNATIONAL USA ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 11–1025. Argued October 29, 2012—Decided February 26, 2013

Section 702 of the Foreign Intelligence Surveillance Act of 1978 (FISA),
50 U. S. C. §1881a, added by the FISA Amendments Act of 2008,
permits the Attorney General and the Director of National Intelli-
gence to acquire foreign intelligence information by jointly authoriz-
ing the surveillance of individuals who are not "United States per-
sons" and are reasonably believed to be located outside the United
States. Before doing so, the Attorney General and the Director of Na-
tional Intelligence normally must obtain the Foreign Intelligence
Surveillance Court's (FISC) approval. Surveillance under §1881a is
subject to statutory conditions, judicial authorization, congressional
supervision, and compliance with the Fourth Amendment. Respond-
ents—attorneys and human rights, labor, legal, and media organiza-
tions—are United States persons who claim that they engage in sen-
sitive international communications with individuals who they
believe are likely targets of §1881a surveillance. On the day that the
FISA Amendments Act was enacted, they filed suit, seeking a decla-
ration that §1881a is facially unconstitutional and a permanent in-
junction against §1881a-authorized surveillance. The District Court
found that respondents lacked standing, but the Second Circuit re-
versed, holding that respondents showed (1) an "objectively reasona-
ble likelihood" that their communications will be intercepted at some
time in the future, and (2) that they are suffering present injuries re-
sulting from costly and burdensome measures they take to protect
the confidentiality of their international communications from possi-
ble §1881a surveillance.

*Held*: Respondents do not have Article III standing. Pp. 8–24.

(a) To establish Article III standing, an injury must be "concrete,

particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co.* v. *Geertson Seed Farms*, 561 U. S. ___, ___. "[T]hreatened injury must be '"certainly impending"' to constitute injury in fact," and "[a]llegations of possible future injury" are not sufficient. *Whitmore* v. *Arkansas*, 495 U. S. 149, 158. Pp. 8–10.

(b) Respondents assert that they have suffered injury in fact that is fairly traceable to §1881a because there is an objectively reasonable likelihood that their communications with their foreign contacts will be intercepted under §1881a at some point. This argument fails. Initially, the Second Circuit's "objectively reasonable likelihood" standard is inconsistent with this Court's "threatened injury" requirement. Respondents' standing theory also rests on a speculative chain of possibilities that does not establish that their potential injury is certainly impending or is fairly traceable to §1881a. First, it is highly speculative whether the Government will imminently target communications to which respondents are parties. Since respondents, as U. S. persons, cannot be targeted under §1881a, their theory necessarily rests on their assertion that their foreign contacts will be targeted. Yet they have no actual knowledge of the Government's §1881a targeting practices. Second, even if respondents could demonstrate that the targeting of their foreign contacts is imminent, they can only speculate as to whether the Government will seek to use §1881a-authorized surveillance instead of one of the Government's numerous other surveillance methods, which are not challenged here. Third, even if respondents could show that the Government will seek FISC authorization to target respondents' foreign contacts under §1881a, they can only speculate as to whether the FISC will authorize the surveillance. This Court is reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment. See, *e.g., Whitmore*, *supra,* at 159–160. Fourth, even if the Government were to obtain the FISC's approval to target respondents' foreign contacts under §1881a, it is unclear whether the Government would succeed in acquiring those contacts' communications. And fifth, even if the Government were to target respondents' foreign contacts, respondents can only speculate as to whether their own communications with those contacts would be incidentally acquired. Pp. 10–15.

(c) Respondents' alternative argument is also unpersuasive. They claim that they suffer ongoing injuries that are fairly traceable to §1881a because the risk of §1881a surveillance requires them to take costly and burdensome measures to protect the confidentiality of their communications. But respondents cannot manufacture standing by choosing to make expenditures based on hypothetical future

harm that is not certainly impending. Because they do not face a threat of certainly impending interception under §1881a, their costs are simply the product of their fear of surveillance, which is insufficient to create standing. See *Laird* v. *Tatum*, 408 U. S. 1, 10–15. Accordingly, any ongoing injuries that respondents are suffering are not fairly traceable to §1881a. Pp. 16–20.

   (d) Respondents' remaining arguments are likewise unavailing. Contrary to their claim, their alleged injuries are not the same kinds of injuries that supported standing in cases such as *Friends of the Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.,* 528 U. S. 167, *Meese* v. *Keene*, 481 U. S. 465, and *Monsanto, supra.* And their suggestion that they should be held to have standing because otherwise the constitutionality of §1881a will never be adjudicated is both legally and factually incorrect. First, " '[t]he assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing.' " *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U. S. 464, 489. Second, the holding in this case by no means insulates §1881a from judicial review. Pp. 20–23.

638 F. 3d 118, reversed and remanded.

   ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, and THOMAS, JJ., joined. BREYER, J., filed a dissenting opinion, in which GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 11–1025

JAMES R. CLAPPER, JR., DIRECTOR OF NATIONAL INTELLIGENCE, ET AL., PETITIONERS v. AMNESTY INTERNATIONAL USA ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[February 26, 2013]

JUSTICE ALITO delivered the opinion of the Court.

Section 702 of the Foreign Intelligence Surveillance Act of 1978, 50 U. S. C. §1881a (2006 ed., Supp. V), allows the Attorney General and the Director of National Intelligence to acquire foreign intelligence information by jointly authorizing the surveillance of individuals who are not "United States persons"[1] and are reasonably believed to be located outside the United States. Before doing so, the Attorney General and the Director of National Intelligence normally must obtain the Foreign Intelligence Surveillance Court's approval. Respondents are United States persons whose work, they allege, requires them to engage in sensitive international communications with individuals who they believe are likely targets of surveillance under §1881a. Respondents seek a declaration that §1881a is unconstitutional, as well as an injunction against §1881a-authorized surveillance. The question

---

[1] The term "United States person" includes citizens of the United States, aliens admitted for permanent residence, and certain associations and corporations. 50 U. S. C. §1801(i); see §1881(a).

before us is whether respondents have Article III standing to seek this prospective relief.

Respondents assert that they can establish injury in fact because there is an objectively reasonable likelihood that their communications will be acquired under §1881a at some point in the future. But respondents' theory of *future* injury is too speculative to satisfy the well-established requirement that threatened injury must be "certainly impending." *E.g.*, *Whitmore* v. *Arkansas*, 495 U. S. 149, 158 (1990). And even if respondents could demonstrate that the threatened injury is certainly impending, they still would not be able to establish that this injury is fairly traceable to §1881a. As an alternative argument, respondents contend that they are suffering *present* injury because the risk of §1881a-authorized surveillance already has forced them to take costly and burdensome measures to protect the confidentiality of their international communications. But respondents cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending. We therefore hold that respondents lack Article III standing.

I

A

In 1978, after years of debate, Congress enacted the Foreign Intelligence Surveillance Act (FISA) to authorize and regulate certain governmental electronic surveillance of communications for foreign intelligence purposes. See 92 Stat. 1783, 50 U. S. C. §1801 *et seq.*; 1 D. Kris & J. Wilson, National Security Investigations & Prosecutions §§3.1, 3.7 (2d ed. 2012) (hereinafter Kris & Wilson). In enacting FISA, Congress legislated against the backdrop of our decision in *United States* v. *United States Dist. Court for Eastern Dist. of Mich.*, 407 U. S. 297 (1972) (*Keith*), in which we explained that the standards and procedures that law enforcement officials must follow

when conducting "surveillance of 'ordinary crime'" might not be required in the context of surveillance conducted for domestic national-security purposes. *Id.*, at 322–323. Although the *Keith* opinion expressly disclaimed any ruling "on the scope of the President's surveillance power with respect to the activities of foreign powers," *id.*, at 308, it implicitly suggested that a special framework for foreign intelligence surveillance might be constitutionally permissible, see *id.*, at 322–323.

In constructing such a framework for foreign intelligence surveillance, Congress created two specialized courts. In FISA, Congress authorized judges of the Foreign Intelligence Surveillance Court (FISC) to approve electronic surveillance for foreign intelligence purposes if there is probable cause to believe that "the target of the electronic surveillance is a foreign power or an agent of a foreign power," and that each of the specific "facilities or places at which the electronic surveillance is directed is being used, or is about to be used, by a foreign power or an agent of a foreign power." §105(a)(3), 92 Stat. 1790; see §§105(b)(1)(A), (b)(1)(B), *ibid.*; 1 Kris & Wilson §7:2, at 194–195; *id.,* §16:2, at 528–529. Additionally, Congress vested the Foreign Intelligence Surveillance Court of Review with jurisdiction to review any denials by the FISC of applications for electronic surveillance. §103(b), 92 Stat. 1788; 1 Kris & Wilson §5:7, at 151–153.

In the wake of the September 11th attacks, President George W. Bush authorized the National Security Agency (NSA) to conduct warrantless wiretapping of telephone and e-mail communications where one party to the communication was located outside the United States and a participant in "the call was reasonably believed to be a member or agent of al Qaeda or an affiliated terrorist organization," App. to Pet. for Cert. 403a. See *id.*, at 263a–265a, 268a, 273a–279a, 292a–293a; *American Civil Liberties Union* v. *NSA,* 493 F. 3d 644, 648 (CA6 2007)

(*ACLU*) (opinion of Batchelder, J.). In January 2007, the FISC issued orders authorizing the Government to target international communications into or out of the United States where there was probable cause to believe that one participant to the communication was a member or agent of al Qaeda or an associated terrorist organization. App. to Pet. for Cert. 312a, 398a, 405a. These FISC orders subjected any electronic surveillance that was then occurring under the NSA's program to the approval of the FISC. *Id.*, at 405a; see *id.*, at 312a, 404a. After a FISC Judge subsequently narrowed the FISC's authorization of such surveillance, however, the Executive asked Congress to amend FISA so that it would provide the intelligence community with additional authority to meet the challenges of modern technology and international terrorism. *Id.*, at 315a–318a, 331a–333a, 398a; see *id.*, at 262a, 277a–279a, 287a.

When Congress enacted the FISA Amendments Act of 2008 (FISA Amendments Act), 122 Stat. 2436, it left much of FISA intact, but it "established a new and independent source of intelligence collection authority, beyond that granted in traditional FISA." 1 Kris & Wilson §9:11, at 349–350. As relevant here, §702 of FISA, 50 U. S. C. §1881a (2006 ed., Supp. V), which was enacted as part of the FISA Amendments Act, supplements pre-existing FISA authority by creating a new framework under which the Government may seek the FISC's authorization of certain foreign intelligence surveillance targeting the communications of non-U. S. persons located abroad. Unlike traditional FISA surveillance, §1881a does not require the Government to demonstrate probable cause that the target of the electronic surveillance is a foreign power or agent of a foreign power. Compare §§1805(a)(2)(A), (a)(2)(B), with §§1881a(d)(1), (i)(3)(A); 638 F. 3d 118, 126 (CA2 2011); 1 Kris & Wilson §16:16, at 584. And, unlike traditional FISA, §1881a does not require the

Government to specify the nature and location of each of the particular facilities or places at which the electronic surveillance will occur. Compare §§1805(a)(2)(B), (c)(1) (2006 ed. and Supp. V), with §§1881a(d)(1), (g)(4), (i)(3)(A); 638 F. 3d, at 125–126; 1 Kris & Wilson §16:16, at 585.[2]

The present case involves a constitutional challenge to §1881a. Surveillance under §1881a is subject to statutory conditions, judicial authorization, congressional supervision, and compliance with the Fourth Amendment. Section 1881a provides that, upon the issuance of an order from the Foreign Intelligence Surveillance Court, "the Attorney General and the Director of National Intelligence may authorize jointly, for a period of up to 1 year . . . , the targeting of persons reasonably believed to be located outside the United States to acquire foreign intelligence information." §1881a(a). Surveillance under §1881a may not be intentionally targeted at any person known to be in the United States or any U. S. person reasonably believed to be located abroad. §§1881a(b)(1)–(3); see also §1801(i). Additionally, acquisitions under §1881a must comport with the Fourth Amendment. §1881a(b)(5). Moreover, surveillance under §1881a is subject to congressional oversight and several types of Executive Branch review. See §§1881a(f)(2), (*l*); *Amnesty Int'l USA* v. *McConnell*, 646 F. Supp. 2d 633, 640–641 (SDNY 2009).

Section 1881a mandates that the Government obtain the Foreign Intelligence Surveillance Court's approval of "targeting" procedures, "minimization" procedures, and a governmental certification regarding proposed surveillance. §§1881a(a), (c)(1), (i)(2), (i)(3). Among other things, the Government's certification must attest that (1) procedures are in place "that have been approved, have been submitted for approval, or will be submitted with the

_____

[2] Congress recently reauthorized the FISA Amendments Act for another five years. See 126 Stat. 1631.

certification for approval by the [FISC] that are reasonably designed" to ensure that an acquisition is "limited to targeting persons reasonably believed to be located outside" the United States; (2) minimization procedures adequately restrict the acquisition, retention, and dissemination of nonpublic information about unconsenting U. S. persons, as appropriate; (3) guidelines have been adopted to ensure compliance with targeting limits and the Fourth Amendment; and (4) the procedures and guidelines referred to above comport with the Fourth Amendment. §1881a(g)(2); see §1801(h).

The Foreign Intelligence Surveillance Court's role includes determining whether the Government's certification contains the required elements. Additionally, the Court assesses whether the targeting procedures are "reasonably designed" (1) to "ensure that an acquisition . . . is limited to targeting persons reasonably believed to be located outside the United States" and (2) to "prevent the intentional acquisition of any communication as to which the sender and all intended recipients are known . . . to be located in the United States." §1881a(i)(2)(B). The Court analyzes whether the minimization procedures "meet the definition of minimization procedures under section 1801(h) . . . , as appropriate." §1881a(i)(2)(C). The Court also assesses whether the targeting and minimization procedures are consistent with the statute and the Fourth Amendment. See §1881a(i)(3)(A).[3]

---

[3] The dissent attempts to downplay the safeguards established by §1881a. See *post,* at 4 (opinion of BREYER, J.). Notably, the dissent does not directly acknowledge that §1881a surveillance must comport with the Fourth Amendment, see §1881a(b)(5), and that the Foreign Intelligence Surveillance Court must assess whether targeting and minimization procedures are consistent with the Fourth Amendment, see §1881a(i)(3)(A).

## B

Respondents are attorneys and human rights, labor, legal, and media organizations whose work allegedly requires them to engage in sensitive and sometimes privileged telephone and e-mail communications with colleagues, clients, sources, and other individuals located abroad. Respondents believe that some of the people with whom they exchange foreign intelligence information are likely targets of surveillance under §1881a. Specifically, respondents claim that they communicate by telephone and e-mail with people the Government "believes or believed to be associated with terrorist organizations," "people located in geographic areas that are a special focus" of the Government's counterterrorism or diplomatic efforts, and activists who oppose governments that are supported by the United States Government. App. to Pet. for Cert. 399a.

Respondents claim that §1881a compromises their ability to locate witnesses, cultivate sources, obtain information, and communicate confidential information to their clients. Respondents also assert that they "have ceased engaging" in certain telephone and e-mail conversations. *Id.,* at 400a. According to respondents, the threat of surveillance will compel them to travel abroad in order to have in-person conversations. In addition, respondents declare that they have undertaken "costly and burdensome measures" to protect the confidentiality of sensitive communications. *Ibid.*

## C

On the day when the FISA Amendments Act was enacted, respondents filed this action seeking (1) a declaration that §1881a, on its face, violates the Fourth Amendment, the First Amendment, Article III, and separation-of-powers principles and (2) a permanent injunction against the use of §1881a. Respondents assert what they charac-

terize as two separate theories of Article III standing. First, they claim that there is an objectively reasonable likelihood that their communications will be acquired under §1881a at some point in the future, thus causing them injury. Second, respondents maintain that the risk of surveillance under §1881a is so substantial that they have been forced to take costly and burdensome measures to protect the confidentiality of their international communications; in their view, the costs they have incurred constitute present injury that is fairly traceable to §1881a.

After both parties moved for summary judgment, the District Court held that respondents do not have standing. *McConnell*, 646 F. Supp. 2d, at 635. On appeal, however, a panel of the Second Circuit reversed. The panel agreed with respondents' argument that they have standing due to the objectively reasonable likelihood that their communications will be intercepted at some time in the future. 638 F. 3d, at 133, 134, 139. In addition, the panel held that respondents have established that they are suffering "*present* injuries in fact—economic and professional harms—stemming from a reasonable fear of *future* harmful government conduct." *Id.*, at 138. The Second Circuit denied rehearing en banc by an equally divided vote. 667 F. 3d 163 (2011).

Because of the importance of the issue and the novel view of standing adopted by the Court of Appeals, we granted certiorari, 566 U. S. ___ (2012), and we now reverse.

## II

Article III of the Constitution limits federal courts' jurisdiction to certain "Cases" and "Controversies." As we have explained, "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *DaimlerChrysler Corp.* v.

*Cuno*, 547 U. S. 332, 341 (2006) (internal quotation marks omitted); *Raines* v. *Byrd*, 521 U. S. 811, 818 (1997) (internal quotation marks omitted); see, *e.g.*, *Summers* v. *Earth Island Institute*, 555 U. S. 488, 492–493 (2009). "One element of the case-or-controversy requirement" is that plaintiffs "must establish that they have standing to sue." *Raines*, *supra,* at 818; see also *Summers*, *supra*, at 492–493; *DaimlerChrysler Corp.*, *supra*, at 342; *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560 (1992).

The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches. *Summers*, *supra*, at 492–493; *DaimlerChrysler Corp.*, *supra*, at 341–342, 353; *Raines*, *supra*, at 818–820; *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U. S. 464, 471–474 (1982); *Schlesinger* v. *Reservists Comm. to Stop the War*, 418 U. S. 208, 221–222 (1974). In keeping with the purpose of this doctrine, "[o]ur standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines*, *supra*, at 819–820; see *Valley Forge Christian College*, *supra*, at 473–474; *Schlesinger*, *supra*, at 221–222. "Relaxation of standing requirements is directly related to the expansion of judicial power," *United States* v. *Richardson*, 418 U. S. 166, 188 (1974) (Powell, J., concurring); see also *Summers*, *supra*, at 492–493; *Schlesinger*, *supra*, at 222, and we have often found a lack of standing in cases in which the Judiciary has been requested to review actions of the political branches in the fields of intelligence gathering and foreign affairs, see, *e.g.*, *Richardson*, *supra*, at 167–170 (plaintiff lacked standing to challenge the constitutionality of a statute permitting the Central Intelligence Agency to account for its expenditures solely on the certificate of the

CIA Director); *Schlesinger*, *supra*, at 209–211 (plaintiffs lacked standing to challenge the Armed Forces Reserve membership of Members of Congress); *Laird* v. *Tatum*, 408 U. S. 1, 11–16 (1972) (plaintiffs lacked standing to challenge an Army intelligence-gathering program).

To establish Article III standing, an injury must be "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co.* v. *Geertson Seed Farms*, 561 U. S. ___, ___ (2010) (slip op., at 7); see also *Summers*, *supra*, at 493; *Defenders of Wildlife*, 504 U. S., at 560–561. "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Id.*, at 565, n. 2 (internal quotation marks omitted).    Thus, we have repeatedly reiterated that "threatened injury must be *certainly impending* to constitute injury in fact," and that "[a]llegations of *possible* future injury" are not sufficient.  *Whitmore*, 495 U. S., at 158 (emphasis added; internal quotation marks omitted); see also *Defenders of Wildlife*, *supra*, at 565, n. 2, 567, n. 3; see *DaimlerChrysler Corp.*, *supra*, at 345; *Friends of the Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.*, 528 U. S. 167, 190 (2000); *Babbitt* v. *Farm Workers*, 442 U. S. 289, 298 (1979).

### III

### A

Respondents assert that they can establish injury in fact that is fairly traceable to §1881a because there is an objectively reasonable likelihood that their communications with their foreign contacts will be intercepted under §1881a at some point in the future.  This argument fails. As an initial matter, the Second Circuit's "objectively reasonable likelihood" standard is inconsistent with our

requirement that "threatened injury must be certainly impending to constitute injury in fact." *Whitmore*, *supra*, at 158 (internal quotation marks omitted); see also *DaimlerChrysler Corp.*, *supra*, at 345; *Laidlaw*, *supra*, at 190; *Defenders of Wildlife*, *supra*, at 565, n. 2; *Babbitt*, *supra*, at 298. Furthermore, respondents' argument rests on their highly speculative fear that: (1) the Government will decide to target the communications of non-U. S. persons with whom they communicate; (2) in doing so, the Government will choose to invoke its authority under §1881a rather than utilizing another method of surveillance; (3) the Article III judges who serve on the Foreign Intelligence Surveillance Court will conclude that the Government's proposed surveillance procedures satisfy §1881a's many safeguards and are consistent with the Fourth Amendment; (4) the Government will succeed in intercepting the communications of respondents' contacts; and (5) respondents will be parties to the particular communications that the Government intercepts. As discussed below, respondents' theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy the requirement that threatened injury must be certainly impending. See *Summers*, *supra*, at 496 (rejecting a standing theory premised on a speculative chain of possibilities); *Whitmore*, *supra*, at 157–160 (same). Moreover, even if respondents could demonstrate injury in fact, the second link in the above-described chain of contingencies—which amounts to mere speculation about whether surveillance would be under §1881a or some other authority—shows that respondents cannot satisfy the requirement that any injury in fact must be fairly traceable to §1881a.

First, it is speculative whether the Government will imminently target communications to which respondents are parties. Section 1881a expressly provides that respondents, who are U. S. persons, cannot be targeted for

surveillance under §1881a.  See §§1881a(b)(1)–(3);  667
F. 3d, at 173 (Raggi, J., dissenting from denial of rehear-
ing en banc).  Accordingly, it is no surprise that respond-
ents fail to offer any evidence that their communications
have been monitored under §1881a, a failure that sub-
stantially undermines their standing theory.  See *ACLU*,
493 F. 3d, at 655–656, 673–674 (opinion of Batchelder, J.)
(concluding that plaintiffs who lacked evidence that their
communications had been intercepted did not have stand-
ing to challenge alleged NSA surveillance).  Indeed, re-
spondents do not even allege that the Government has
sought the FISC's approval for surveillance of their com-
munications.  Accordingly, respondents' theory necessarily
rests on their assertion that the Government will target
*other individuals*—namely, their foreign contacts.

  Yet respondents have no actual knowledge of the
Government's §1881a targeting practices.  Instead, re-
spondents merely speculate and make assumptions about
whether their communications with their foreign contacts
will be acquired under §1881a.  See 667 F. 3d, at 185–187
(opinion of Raggi, J.).  For example, journalist Christopher
Hedges states:  "I have no choice but to *assume* that any of
my international communications *may* be subject to gov-
ernment surveillance, and I have to make decisions . . . in
light of that *assumption*."  App. to Pet. for Cert. 366a
(emphasis added and deleted).  Similarly, attorney Scott
McKay asserts that, "[b]ecause of the [FISA Amendments
Act], we now have to *assume* that every one of our interna-
tional communications *may* be monitored by the govern-
ment."  *Id.*, at 375a (emphasis added); see also *id.*, at 337a,
343a–344a, 350a, 356a.  "The party invoking federal juris-
diction bears the burden of establishing" standing—and,
at the summary judgment stage, such a party "can no
longer rest on . . . 'mere allegations,' but must 'set forth' by
affidavit or other evidence 'specific facts.'"  *Defenders of
Wildlife*, 504 U. S., at 561.  Respondents, however, have

set forth no specific facts demonstrating that the communications of their foreign contacts will be targeted. Moreover, because §1881a at most *authorizes*—but does not *mandate* or *direct*—the surveillance that respondents fear, respondents' allegations are necessarily conjectural. See *United Presbyterian Church in U. S. A.* v. *Reagan*, 738 F. 2d 1375, 1380 (CADC 1984) (Scalia, J.); 667 F. 3d, at 187 (opinion of Raggi, J.). Simply put, respondents can only speculate as to how the Attorney General and the Director of National Intelligence will exercise their discretion in determining which communications to target.[4]

Second, even if respondents could demonstrate that the targeting of their foreign contacts is imminent, respondents can only speculate as to whether the Government will seek to use §1881a-authorized surveillance (rather than other methods) to do so. The Government has numerous other methods of conducting surveillance, none of which is challenged here. Even after the enactment of the FISA Amendments Act, for example, the Government may still conduct electronic surveillance of persons abroad under the older provisions of FISA so long as it satisfies the

———————

[4] It was suggested at oral argument that the Government could help resolve the standing inquiry by disclosing to a court, perhaps through an *in camera* proceeding, (1) whether it is intercepting respondents' communications and (2) what targeting or minimization procedures it is using. See Tr. of Oral Arg. 13–14, 44, 56. This suggestion is puzzling. As an initial matter, it is *respondents'* burden to prove their standing by pointing to specific facts, *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 561 (1992), not the Government's burden to disprove standing by revealing details of its surveillance priorities. Moreover, this type of hypothetical disclosure proceeding would allow a terrorist (or his attorney) to determine whether he is currently under U. S. surveillance simply by filing a lawsuit challenging the Government's surveillance program. Even if the terrorist's attorney were to comply with a protective order prohibiting him from sharing the Government's disclosures with his client, the court's postdisclosure decision about whether to dismiss the suit for lack of standing would surely signal to the terrorist whether his name was on the list of surveillance targets.

applicable requirements, including a demonstration of probable cause to believe that the person is a foreign power or agent of a foreign power. See §1805. The Government may also obtain information from the intelligence services of foreign nations. Brief for Petitioners 33. And, although we do not reach the question, the Government contends that it can conduct FISA-exempt human and technical surveillance programs that are governed by Executive Order 12333. See Exec. Order No. 12333, §§1.4, 2.1–2.5, 3 CFR 202, 210–212 (1981), reprinted as amended, note following 50 U. S. C. §401, pp. 543, 547–548. Even if respondents could demonstrate that their foreign contacts will imminently be targeted—indeed, even if they could show that interception of their own communications will imminently occur—they would still need to show that their injury is fairly traceable to §1881a. But, because respondents can only speculate as to whether any (asserted) interception would be under §1881a or some other authority, they cannot satisfy the "fairly traceable" requirement.

Third, even if respondents could show that the Government will seek the Foreign Intelligence Surveillance Court's authorization to acquire the communications of respondents' foreign contacts under §1881a, respondents can only speculate as to whether that court will authorize such surveillance. In the past, we have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment. In *Whitmore*, for example, the plaintiff's theory of standing hinged largely on the probability that he would obtain federal habeas relief and be convicted upon retrial. In holding that the plaintiff lacked standing, we explained that "[i]t is just not possible for a litigant to prove in advance that the judicial system will lead to any particular result in his case." 495 U. S., at 159–160; see *Defenders of Wildlife*, 504 U. S., at 562.

Opinion of the Court

We decline to abandon our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors. Section 1881a mandates that the Government must obtain the Foreign Intelligence Surveillance Court's approval of targeting procedures, minimization procedures, and a governmental certification regarding proposed surveillance. §§1881a(a), (c)(1), (i)(2), (i)(3). The Court must, for example, determine whether the Government's procedures are "reasonably designed . . . to minimize the acquisition and retention, and prohibit the dissemination, of nonpublicly available information concerning unconsenting United States persons." §1801(h); see §§1881a(i)(2), (i)(3)(A). And, critically, the Court must also assess whether the Government's targeting and minimization procedures comport with the Fourth Amendment. §1881a(i)(3)(A).

Fourth, even if the Government were to obtain the Foreign Intelligence Surveillance Court's approval to target respondents' foreign contacts under §1881a, it is unclear whether the Government would succeed in acquiring the communications of respondents' foreign contacts. And fifth, even if the Government were to conduct surveillance of respondents' foreign contacts, respondents can only speculate as to whether *their own communications* with their foreign contacts would be incidentally acquired.

In sum, respondents' speculative chain of possibilities does not establish that injury based on potential future surveillance is certainly impending or is fairly traceable to §1881a.[5]

_____

[5] Our cases do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about. In some instances, we have found standing based on a "substantial risk" that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm. *Monsanto Co.* v. *Geertson Seed Farms*, 561 U. S. ___, ___ (2010) (slip op., at 11–12). See also *Pennell* v. *City of San Jose*, 485 U. S. 1, 8 (1988); *Blum* v. *Yaretsky*, 457

B

Respondents' alternative argument—namely, that they can establish standing based on the measures that they have undertaken to avoid §1881a-authorized surveillance—fares no better. Respondents assert that they are suffering ongoing injuries that are fairly traceable to §1881a because the risk of surveillance under §1881a requires them to take costly and burdensome measures to protect the confidentiality of their communications. Respondents claim, for instance, that the threat of surveillance sometimes compels them to avoid certain e-mail and phone conversations, to "tal[k] in generalities rather than specifics," or to travel so that they can have in-person conversations. Tr. of Oral Arg. 38; App. to Pet. for Cert. 338a, 345a, 367a, 400a.[6] The Second Circuit panel concluded that, because respondents are already suffering such ongoing injuries, the likelihood of interception under §1881a is relevant only to the question whether respondents' ongoing injuries are "fairly traceable" to §1881a. See

U. S. 991, 1000–1001 (1982); *Babbitt* v. *Farm Workers*, 442 U. S. 289, 298 (1979). But to the extent that the "substantial risk" standard is relevant and is distinct from the "clearly impending" requirement, respondents fall short of even that standard, in light of the attenuated chain of inferences necessary to find harm here. See *supra,* at 11–15. In addition, plaintiffs bear the burden of pleading and proving concrete facts showing that the defendant's actual action has caused the substantial risk of harm. Plaintiffs cannot rely on speculation about "'the unfettered choices made by independent actors not before the court.'" *Defenders of Wildlife*, 504 U. S., at 562.

[6] For all the focus on respondents' supposed need to travel abroad in light of potential §1881a surveillance, respondents cite only one specific instance of travel: an attorney's trip to New York City to meet with other lawyers. See App. to Pet. for Cert. 352a. This domestic travel had but a tenuous connection to §1881a, because §1881a-authorized acquisitions "may not intentionally target any person known at the time of acquisition to be located in the United States." §1881a(b)(1); see also 667 F. 3d 163, 202 (CA2 2011) (Jacobs, C. J., dissenting from denial of rehearing en banc); *id.*, at 185 (opinion of Raggi, J. (same)).

638 F. 3d, at 133–134; 667 F. 3d, at 180 (opinion of Raggi, J.). Analyzing the "fairly traceable" element of standing under a relaxed reasonableness standard, see 638 F. 3d, at 133–134, the Second Circuit then held that "plaintiffs have established that they suffered *present* injuries in fact—economic and professional harms—stemming from a reasonable fear of *future* harmful government conduct," *id.*, at 138.

The Second Circuit's analysis improperly allowed respondents to establish standing by asserting that they suffer present costs and burdens that are based on a fear of surveillance, so long as that fear is not "fanciful, paranoid, or otherwise unreasonable." See *id.*, at 134. This improperly waters down the fundamental requirements of Article III. Respondents' contention that they have standing because they incurred certain costs as a reasonable reaction to a risk of harm is unavailing—because the harm respondents seek to avoid is not certainly impending. In other words, respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending. See *Pennsylvania* v. *New Jersey*, 426 U. S. 660, 664 (1976) (*per curiam*); *National Family Planning & Reproductive Health Assn., Inc.*, 468 F. 3d 826, 831 (CADC 2006). Any ongoing injuries that respondents are suffering are not fairly traceable to §1881a.

If the law were otherwise, an enterprising plaintiff would be able to secure a lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear. As Judge Raggi accurately noted, under the Second Circuit panel's reasoning, respondents could, "for the price of a plane ticket, . . . transform their standing burden from one requiring a showing of actual or imminent . . . interception to one requiring a showing that their subjective fear of such interception is not fanciful, irrational, or clearly unreasonable." 667 F. 3d, at 180

(internal quotation marks omitted). Thus, allowing respondents to bring this action based on costs they incurred in response to a speculative threat would be tantamount to accepting a repackaged version of respondents' first failed theory of standing. See *ACLU*, 493 F. 3d, at 656–657 (opinion of Batchelder, J.).

Another reason that respondents' present injuries are not fairly traceable to §1881a is that even before §1881a was enacted, they had a similar incentive to engage in many of the countermeasures that they are now taking. See *id.,* at 668–670. For instance, respondent Scott McKay's declaration describes—and the dissent heavily relies on—Mr. McKay's "knowledge" that thousands of communications involving one of his clients were monitored in the past. App. to Pet. for Cert. 370a; *post,* at 4, 7–8. But this surveillance was conducted pursuant to FISA authority that predated §1881a. See Brief for Petitioners 32, n. 11; *Al-Kidd* v. *Gonzales*, No. 05–cv–93, 2008 WL 5123009 (D Idaho, Dec. 4, 2008). Thus, because the Government was allegedly conducting surveillance of Mr. McKay's client before Congress enacted §1881a, it is difficult to see how the safeguards that Mr. McKay now claims to have implemented can be traced to §1881a.

Because respondents do not face a threat of certainly impending interception under §1881a, the costs that they have incurred to avoid surveillance are simply the product of their fear of surveillance,[7] and our decision in *Laird*

─────────────

[7] Although respondents' alternative theory of standing rests primarily on choices that *they* have made based on their subjective fear of surveillance, respondents also assert that third parties might be disinclined to speak with them due to a fear of surveillance. See App. to Pet. for Cert. 372a–373a, 352a–353a. To the extent that such assertions are based on anything other than conjecture, see *Defenders of Wildlife*, 504 U. S., at 560, they do not establish injury that is fairly traceable to §1881a, because they are based on third parties' subjective fear of surveillance, see *Laird*, 408 U. S., at 10–14.

makes it clear that such a fear is insufficient to create standing. See 408 U. S., at 10–15. The plaintiffs in *Laird* argued that their exercise of First Amendment rights was being "chilled by the mere existence, without more, of [the Army's] investigative and data-gathering activity." *Id.*, at 10. While acknowledging that prior cases had held that constitutional violations may arise from the chilling effect of "regulations that fall short of a direct prohibition against the exercise of First Amendment rights," the Court declared that none of those cases involved a "chilling effect aris[ing] merely from the individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some *other* and additional action detrimental to that individual." *Id.*, at 11. Because "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm," *id.*, at 13–14, the plaintiffs in *Laird*—and respondents here—lack standing. See *ibid.*; *ACLU*, *supra*, at 661–662 (opinion of Batchelder, J.) (holding that plaintiffs lacked standing because they "allege[d] only a subjective apprehension" of alleged NSA surveillance and "a personal (self-imposed) unwillingness to communicate"); *United Presbyterian Church*, 738 F. 2d, at 1378 (holding that plaintiffs lacked standing to challenge the legality of an Executive Order relating to surveillance because "the 'chilling effect' which is produced by their fear of being subjected to illegal surveillance and which deters them from conducting constitutionally protected activities, is foreclosed as a basis for standing" by *Laird*).

  For the reasons discussed above, respondents' self-inflicted injuries are not fairly traceable to the Government's purported activities under §1881a, and their subjective fear of surveillance does not give rise to standing.

## IV
## A

Respondents incorrectly maintain that "[t]he kinds of injuries incurred here—injuries incurred because of [respondents'] reasonable efforts to avoid greater injuries that are otherwise likely to flow from the conduct they challenge—are the same kinds of injuries that this Court held to support standing in cases such as" *Laidlaw, Meese* v. *Keene*, 481 U. S. 465 (1987), and *Monsanto.* Brief for Respondents 24. As an initial matter, none of these cases holds or even suggests that plaintiffs can establish standing simply by claiming that they experienced a "chilling effect" that resulted from a governmental policy that does not regulate, constrain, or compel any action on their part. Moreover, each of these cases was very different from the present case.

In *Laidlaw*, plaintiffs' standing was based on "the proposition that a company's continuous and pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of that waterway and would subject them to other economic and aesthetic harms." 528 U. S., at 184. Because the unlawful discharges of pollutants were "concededly ongoing," the only issue was whether "nearby residents"—who were members of the organizational plaintiffs—acted reasonably in refraining from using the polluted area. *Id.*, at 183–184. *Laidlaw* is therefore quite unlike the present case, in which it is not "concede[d]" that respondents would be subject to unlawful surveillance but for their decision to take preventive measures. See *ACLU*, 493 F. 3d, at 686 (opinion of Batchelder, J.) (distinguishing *Laidlaw* on this ground); *id.*, at 689–690 (Gibbons, J., concurring) (same); 667 F. 3d, at 182–183 (opinion of Raggi, J.) (same). *Laidlaw* would resemble this case only if (1) it were undisputed that the Government was using §1881a-authorized surveillance to acquire respondents' communi-

cations and (2) the sole dispute concerned the reasonableness of respondents' preventive measures.

In *Keene*, the plaintiff challenged the constitutionality of the Government's decision to label three films as "political propaganda." 481 U. S., at 467. The Court held that the plaintiff, who was an attorney and a state legislator, had standing because he demonstrated, through "detailed affidavits," that he "could not exhibit the films without incurring a risk of injury to his reputation and of an impairment of his political career." *Id.,* at 467, 473–475. Unlike the present case, *Keene* involved "more than a 'subjective chill'" based on speculation about potential governmental action; the plaintiff in that case was unquestionably regulated by the relevant statute, and the films that he wished to exhibit had already been labeled as "political propaganda." See *ibid.*; *ACLU*, 493 F. 3d, at 663–664 (opinion of Batchelder, J.); *id.*, at 691 (Gibbons, J., concurring).

*Monsanto*, on which respondents also rely, is likewise inapposite. In *Monsanto*, conventional alfalfa farmers had standing to seek injunctive relief because the agency's decision to deregulate a variety of genetically engineered alfalfa gave rise to a "significant risk of gene flow to non-genetically-engineered varieties of alfalfa." 561 U. S., at \_\_\_ (slip op., at 13). The standing analysis in that case hinged on evidence that genetically engineered alfalfa "'seed fields [we]re currently being planted in all the major alfalfa seed production areas'"; the bees that pollinate alfalfa "'have a range of at least two to ten miles'"; and the alfalfa seed farms were concentrated in an area well within the bees' pollination range. *Id.*, at \_\_\_–\_\_\_, and n. 3 (slip op., at 11–12, and n. 3). Unlike the conventional alfalfa farmers in *Monsanto*, however, respondents in the present case present no concrete evidence to substantiate their fears, but instead rest on mere conjecture about possible governmental actions.

### B

Respondents also suggest that they should be held to have standing because otherwise the constitutionality of §1881a could not be challenged.  It would be wrong, they maintain, to "insulate the government's surveillance activities from meaningful judicial review."   Brief for Respondents 60.  Respondents' suggestion is both legally and factually incorrect.  First, "'[t]he assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing.'"  *Valley Forge Christian College*, 454 U. S., at 489; *Schlesinger*, 418 U. S., at 227; see also *Richardson*, 418 U. S., at 179; *Raines*, 521 U. S., at 835 (Souter, J., joined by GINSBURG, J., concurring in judgment).

Second, our holding today by no means insulates §1881a from judicial review.  As described above, Congress created a comprehensive scheme in which the Foreign Intelligence Surveillance Court evaluates the Government's certifications, targeting procedures, and minimization procedures—including assessing whether the targeting and minimization procedures comport with the Fourth Amendment.  §§1881a(a), (c)(1), (i)(2), (i)(3).  Any dissatisfaction that respondents may have about the Foreign Intelligence Surveillance Court's rulings—or the congressional delineation of that court's  role—is irrelevant to our standing analysis.

Additionally, if the Government intends to use or disclose information obtained or derived from a §1881a acquisition in judicial or administrative proceedings, it must provide advance notice of its intent, and the affected person may challenge the lawfulness of the acquisition.  §§1806(c), 1806(e), 1881e(a) (2006 ed. and Supp. V).[8]

---

[8] The possibility of judicial review in this context is not farfetched.  In *United States* v. *Damrah*, 412 F. 3d 618 (CA6 2005), for example, the Government made a pretrial disclosure that it intended to use FISA

Thus, if the Government were to prosecute one of respondent-attorney's foreign clients using §1881a-authorized surveillance, the Government would be required to make a disclosure. Although the foreign client might not have a viable Fourth Amendment claim, see, *e.g.*, *United States* v. *Verdugo-Urquidez*, 494 U. S. 259, 261 (1990), it is possible that the monitoring of the target's conversations with his or her attorney would provide grounds for a claim of standing on the part of the attorney. Such an attorney would certainly have a stronger evidentiary basis for establishing standing than do respondents in the present case. In such a situation, unlike in the present case, it would at least be clear that the Government had acquired the foreign client's communications using §1881a-authorized surveillance.

Finally, any electronic communications service provider that the Government directs to assist in §1881a surveillance may challenge the lawfulness of that directive before the FISC. §§1881a(h)(4), (6). Indeed, at the behest of a service provider, the Foreign Intelligence Surveillance Court of Review previously analyzed the constitutionality of electronic surveillance directives issued pursuant to a now-expired set of FISA amendments. See *In re Directives Pursuant to Section 105B of Foreign Intelligence Surveillance Act*, 551 F. 3d 1004, 1006–1016 (2008) (holding that the provider had standing and that the directives were constitutional).

\*    \*    \*

We hold that respondents lack Article III standing because they cannot demonstrate that the future injury

---

evidence in a prosecution; the defendant (unsuccessfully) moved to suppress the FISA evidence, even though he had not been the *target* of the surveillance; and the Sixth Circuit ultimately held that FISA's procedures are consistent with the Fourth Amendment. See *id.*, at 622, 623, 625.

they purportedly fear is certainly impending and because they cannot manufacture standing by incurring costs in anticipation of non-imminent harm.  We therefore reverse the judgment of the Second Circuit and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 11–1025

_____

## JAMES R. CLAPPER, JR., DIRECTOR OF NATIONAL INTELLIGENCE, ET AL., PETITIONERS *v.* AMNESTY INTERNATIONAL USA ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[February 26, 2013]

JUSTICE BREYER, with whom JUSTICE GINSBURG, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, dissenting.

The plaintiffs' standing depends upon the likelihood that the Government, acting under the authority of 50 U. S. C. §1881a (2006 ed., Supp. V), will harm them by intercepting at least some of their private, foreign, telephone, or e-mail conversations. In my view, this harm is not "speculative." Indeed it is as likely to take place as are most future events that commonsense inference and ordinary knowledge of human nature tell us will happen. This Court has often found the occurrence of similar future events sufficiently certain to support standing. I dissent from the Court's contrary conclusion.

I

Article III specifies that the "judicial Power" of the United States extends only to actual "Cases" and "Controversies." §2. It thereby helps to ensure that the legal questions presented to the federal courts will not take the form of abstract intellectual problems resolved in the "rarified atmosphere of a debating society" but instead those questions will be presented "in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian College*

v. *Americans United for Separation of Church and State, Inc.*, 454 U. S. 464, 472 (1982) (purpose of Article III); *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560 (1992) (similar); *Babbitt* v. *Farm Workers*, 442 U. S. 289, 297 (1979) (similar).

The Court has recognized that the precise boundaries of the "case or controversy" requirement are matters of "degree . . . not discernible by any precise test." *Ibid.* At the same time, the Court has developed a subsidiary set of legal rules that help to determine when the Constitution's requirement is met. See *Lujan*, 504 U. S., at 560–561; *id.,* at 583 (Stevens, J., concurring in judgment). Thus, a plaintiff must have "standing" to bring a legal claim. And a plaintiff has that standing, the Court has said, only if the action or omission that the plaintiff challenges has caused, or will cause, the plaintiff to suffer an injury that is "concrete and particularized," "actual or imminent," and "redress[able] by a favorable decision." *Id.*, at 560–561 (internal quotation marks omitted).

No one here denies that the Government's interception of a private telephone or e-mail conversation amounts to an injury that is "concrete and particularized." Moreover, the plaintiffs, respondents here, seek as relief a judgment declaring unconstitutional (and enjoining enforcement of) a statutory provision authorizing those interceptions; and, such a judgment would redress the injury by preventing it. Thus, the basic question is whether the injury, *i.e.,* the interception, is "actual or imminent."

II

A

Since the plaintiffs fear interceptions of a kind authorized by §1881a, it is important to understand just what kind of surveillance that section authorizes. Congress enacted §1881a in 2008, as an amendment to the preexisting Foreign Intelligence Surveillance Act of 1978, 50

U. S. C. §1801 *et seq.* Before the amendment, the Act authorized the Government (acting within the United States) to monitor private electronic communications between the United States and a foreign country if (1) the Government's purpose was, in significant part, to obtain foreign intelligence information (which includes information concerning a "foreign power" or "territory" related to our "national defense" or "security" or the "conduct of . . . foreign affairs"), (2) the Government's surveillance target was "a foreign power or an agent of a foreign power," and (3) the Government used surveillance procedures designed to "minimize the acquisition and retention, and prohibit the dissemination, of" any private information acquired about Americans. §§1801(e), (h), 1804(a).

In addition the Government had to obtain the approval of the Foreign Intelligence Surveillance Court. To do so, it had to submit an application describing (1) each "specific target," (2) the "nature of the information sought," and (3) the "type of communications or activities to be subjected to the surveillance." §1804(a). It had to certify that, in significant part, it sought to obtain foreign intelligence information. *Ibid.* It had to demonstrate probable cause to believe that each specific target was "a foreign power or an agent of a foreign power." §§1804(a), 1805(a). It also had to describe instance-specific procedures to be used to minimize intrusions upon Americans' privacy (compliance with which the court subsequently could assess). §§1804(a), 1805(d)(3).

The addition of §1881a in 2008 changed this prior law in three important ways. First, it eliminated the requirement that the Government describe to the court each specific target and identify each facility at which its surveillance would be directed, thus permitting surveillance on a programmatic, not necessarily individualized, basis. §1881a(g). Second, it eliminated the requirement that a target be a "foreign power or an agent of a foreign power."

*Ibid.* Third, it diminished the court's authority to insist upon, and eliminated its authority to supervise, instance-specific privacy-intrusion minimization procedures (though the Government still must use court-approved general minimization procedures). §1881a(e). Thus, using the authority of §1881a, the Government can obtain court approval for its surveillance of electronic communications between places within the United States and targets in foreign territories by showing the court (1) that "a significant purpose of the acquisition is to obtain foreign intelligence information," and (2) that it will use general targeting and privacy-intrusion minimization procedures of a kind that the court had previously approved. §1881a(g).

B

It is similarly important to understand the kinds of communications in which the plaintiffs say they engage and which they believe the Government will intercept. Plaintiff Scott McKay, for example, says in an affidavit (1) that he is a lawyer; (2) that he represented "Mr. Sami Omar Al-Hussayen, who was acquitted in June 2004 on terrorism charges"; (3) that he continues to represent "Mr. Al-Hussayen, who, in addition to facing criminal charges after September 11, was named as a defendant in several civil cases"; (4) that he represents Khalid Sheik Mohammed, a detainee, "before the Military Commissions at Guantánamo Bay, Cuba"; (5) that in representing these clients he "communicate[s] by telephone and email with people outside the United States, including Mr. Al-Hussayen himself," "experts, investigators, attorneys, family members . . . and others who are located abroad"; and (6) that prior to 2008 "the U. S. government had intercepted some 10,000 telephone calls and 20,000 email communications involving [his client] Al-Hussayen." App. to Pet. for Cert. 369a–371a.

Another plaintiff, Sylvia Royce, says in her affidavit (1)

that she is an attorney; (2) that she "represent[s] Mohammedou Ould Salahi, a prisoner who has been held at Guantánamo Bay as an enemy combatant"; (3) that, "[i]n connection with [her] representation of Mr. Salahi, [she] receive[s] calls from time to time from Mr. Salahi's brother, . . . a university student in Germany"; and (4) that she has been told that the Government has threatened Salahi "that his family members would be arrested and mistreated if he did not cooperate." *Id.*, at 349a–351a.

The plaintiffs have noted that McKay no longer represents Mohammed and Royce no longer represents Ould Salahi. Brief for Respondents 15, n. 11. But these changes are irrelevant, for we assess standing as of the time a suit is filed, see *Davis* v. *Federal Election Comm'n*, 554 U. S. 724, 734 (2008), and in any event McKay himself continues to represent Al Hussayen, his partner now represents Mohammed, and Royce continues to represent individuals held in the custody of the U. S. military overseas.

A third plaintiff, Joanne Mariner, says in her affidavit (1) that she is a human rights researcher, (2) that "some of the work [she] do[es] involves trying to track down people who were rendered by the CIA to countries in which they were tortured"; (3) that many of those people "the CIA has said are (or were) associated with terrorist organizations"; and (4) that, to do this research, she "communicate[s] by telephone and e-mail with . . . former detainees, lawyers for detainees, relatives of detainees, political activists, journalists, and fixers" "all over the world, including in Jordan, Egypt, Pakistan, Afghanistan, [and] the Gaza Strip." App. to Pet. for Cert. 343a–344a.

Other plaintiffs, including lawyers, journalists, and human rights researchers, say in affidavits (1) that they have jobs that require them to gather information from foreigners located abroad; (2) that they regularly communicate electronically (*e.g.*, by telephone or e-mail) with

foreigners located abroad; and (3) that in these communications they exchange "foreign intelligence information" as the Act defines it. *Id.*, at 334a–375a.

## III

Several considerations, based upon the record along with commonsense inferences, convince me that there is a very high likelihood that Government, *acting under the authority of §1881a*, will intercept at least some of the communications just described. First, the plaintiffs have engaged, and continue to engage, in electronic communications of a kind that the 2008 amendment, but not the prior Act, authorizes the Government to intercept. These communications include discussions with family members of those detained at Guantanamo, friends and acquaintances of those persons, and investigators, experts and others with knowledge of circumstances related to terrorist activities. These persons are foreigners located outside the United States. They are not "foreign power[s]" or "agent[s] of . . . foreign power[s]." And the plaintiffs state that they exchange with these persons "foreign intelligence information," defined to include information that "relates to" "international terrorism" and "the national defense or the security of the United States." See 50 U. S. C. §1801 (2006 ed. and Supp. V); see, *e.g.,* App. to Pet. for Cert. 342a, 366a, 373a–374a.

Second, the plaintiffs have a strong *motive* to engage in, and the Government has a strong *motive* to listen to, conversations of the kind described. A lawyer representing a client normally seeks to learn the circumstances surrounding the crime (or the civil wrong) of which the client is accused. A fair reading of the affidavit of Scott McKay, for example, taken together with elementary considerations of a lawyer's obligation to his client, indicates that McKay will engage in conversations that concern what suspected foreign terrorists, such as his client,

have done; in conversations that concern his clients' families, colleagues, and contacts; in conversations that concern what those persons (or those connected to them) have said and done, at least in relation to terrorist activities; in conversations that concern the political, social, and commercial environments in which the suspected terrorists have lived and worked; and so forth. See, *e.g., id.*, at 373a–374a. Journalists and human rights workers have strong similar motives to conduct conversations of this kind. See, *e.g., id.*, at 342a (Declaration of Joanne Mariner, stating that "some of the information [she] exchange[s] by telephone and e-mail relates to terrorism and counterterrorism, and much of the information relates to the foreign affairs of the United States").

At the same time, the Government has a strong motive to conduct surveillance of conversations that contain material of this kind. The Government, after all, seeks to learn as much as it can reasonably learn about suspected terrorists (such as those detained at Guantanamo), as well as about their contacts and activities, along with those of friends and family members. See Executive Office of the President, Office of Management and Budget, Statement of Administration Policy on S. 2248, p. 4 (Dec. 17, 2007) ("Part of the value of the [new authority] is to enable the Intelligence Community to collect expeditiously the communications of terrorists in foreign countries who may contact an associate in the United States"). And the Government is motivated to do so, not simply by the desire to help convict those whom the Government believes guilty, but also by the critical, overriding need to protect America from terrorism. See *id.,* at 1 ("Protection of the American people and American interests at home and abroad requires access to timely, accurate, and insightful intelligence on the capabilities, intentions, and activities of . . . terrorists").

Third, the Government's *past behavior* shows that it has

sought, and hence will in all likelihood continue to seek, information about alleged terrorists and detainees through means that include surveillance of electronic communications.  As just pointed out, plaintiff Scott McKay states that the Government (under the authority of the pre-2008 law) "intercepted some 10,000 telephone calls and 20,000 email communications involving [his client] Mr. Al-Hussayen."  App. to Pet. for Cert. 370a.

Fourth, the Government has the *capacity* to conduct electronic surveillance of the kind at issue.  To some degree this capacity rests upon technology available to the Government.  See 1 D. Kris & J. Wilson, National Security Investigations & Prosecutions §16:6, p. 562 (2d ed. 2012) ("NSA's technological abilities are legendary"); *id.,* §16:12, at 572–577 (describing the National Security Agency's capacity to monitor "*very* broad facilities" such as international switches).  See, *e.g.*, Lichtblau & Risen, Spy Agency Mined Vast Data Trove, Officials Report, N. Y. Times, Dec. 24, 2005, p. A1 (describing capacity to trace and to analyze large volumes of communications into and out of the United States); Lichtblau & Shane, Bush is Pressed Over New Report on Surveillance, N. Y. Times, May 12, 2006, p. A1 (reporting capacity to obtain access to records of many, if not most, telephone calls made in the United States); Priest & Arkin, A Hidden World, Growing Beyond Control, Washington Post, July 19, 2010, p. A1 (reporting that every day, collection systems at the National Security Agency intercept and store 1.7 billion e-mails, telephone calls and other types of communications).  Cf. Statement of Administration Policy on S. 2248, *supra*, at 3 (rejecting a provision of the Senate bill that would require intelligence analysts to count "the number of persons located in the United States whose communications were reviewed" as "impossible to implement" (internal quotation marks omitted)).  This capacity also includes the Government's authority to obtain the kind of information here at issue

from private carriers such as AT&T and Verizon. See 50 U. S. C. §1881a(h). We are further told by *amici* that the Government is expanding that capacity. See Brief for Electronic Privacy Information Center et al. as 22–23 (National Security Agency will be able to conduct surveillance of most electronic communications between domestic and foreign points).

Of course, to exercise this capacity the Government must have intelligence court authorization. But the Government rarely files requests that fail to meet the statutory criteria. See Letter from Ronald Weich, Assistant Attorney General, to Joseph R. Biden, Jr., 1 (Apr. 30, 2012) (In 2011, of the 1,676 applications to the intelligence court, two were withdrawn by the Government, and the remaining 1,674 were approved, 30 with some modification), online at http://www.justice.gov/nsd/foia/ foia_library/2011fisa-ltr.pdf. (as visited Feb. 22, 2013, and available in Clerk of Court's case file). As the intelligence court itself has stated, its review under §1881a is "narrowly circumscribed." In re Proceedings Required by §702(i) of the FISA Amendments Act of 2008, No. Misc. 08–01 (Aug. 17, 2008), p. 3. There is no reason to believe that the communications described would all fail to meet the conditions necessary for approval. Moreover, compared with prior law, §1881a simplifies and thus expedites the approval process, making it more likely that the Government will use §1881a to obtain the necessary approval.

The upshot is that (1) similarity of content, (2) strong motives, (3) prior behavior, and (4) capacity all point to a very strong likelihood that the Government will intercept at least some of the plaintiffs' communications, including some that the 2008 amendment, §1881a, but not the pre-2008 Act, authorizes the Government to intercept.

At the same time, nothing suggests the presence of some special factor here that might support a contrary conclusion. The Government does not deny that it has both the

motive and the capacity to listen to communications of the kind described by plaintiffs. Nor does it describe any system for avoiding the interception of an electronic communication that happens to include a party who is an American lawyer, journalist, or human rights worker. One can, of course, always imagine some special circumstance that negates a virtual likelihood, no matter how strong. But the same is true about most, if not all, ordinary inferences about future events. Perhaps, despite pouring rain, the streets will remain dry (due to the presence of a special chemical). But ordinarily a party that seeks to defeat a strong natural inference must bear the burden of showing that some such special circumstance exists. And no one has suggested any such special circumstance here.

Consequently, we need only assume that the Government is doing its job (to find out about, and combat, terrorism) in order to conclude that there is a high probability that the Government will intercept at least some electronic communication to which at least some of the plaintiffs are parties. The majority is wrong when it describes the harm threatened plaintiffs as "speculative."

## IV

### A

The majority more plausibly says that the plaintiffs have failed to show that the threatened harm is "*certainly impending*." *Ante*, at 10 (internal quotation marks omitted). But, as the majority appears to concede, see *ante,* at 15–16, and n. 5, *certainty* is not, and never has been, the touchstone of standing. The future is inherently uncertain. Yet federal courts frequently entertain actions for injunctions and for declaratory relief aimed at preventing future activities that are reasonably likely or highly likely, but not absolutely certain, to take place. And that degree of certainty is all that is needed to support standing here.

The Court's use of the term "certainly impending" is not to the contrary. Sometimes the Court has used the phrase "certainly impending" as if the phrase described a *sufficient,* rather than a *necessary,* condition for jurisdiction. See *Pennsylvania* v. *West Virginia*, 262 U. S. 553, 593 (1923) ("If the injury is certainly impending that is enough"). See also *Babbitt*, 442 U. S., at 298 (same). On other occasions, it has used the phrase as if it concerned *when*, not *whether*, an alleged injury would occur. Thus, in *Lujan*, 504 U. S., at 564, n. 2, the Court considered a threatened future injury that consisted of harm that plaintiffs would suffer when they "soon" visited a government project area that (they claimed) would suffer environmental damage. The Court wrote that a "mere profession of an intent, some day, to return" to the project area did not show the harm was "*imminent*," for "soon" might mean nothing more than "in this lifetime." *Id.,* at 564–565, n. 2 (internal quotation marks omitted). Similarly, in *McConnell* v. *Federal Election Comm'n*, 540 U. S. 93 (2003), the Court denied standing because the Senator's future injury (stemming from a campaign finance law) would not affect him until his reelection. That fact, the Court said, made the injury "too remote temporally to satisfy Article III standing." *Id.,* at 225–226.

On still other occasions, recognizing that "'imminence' is concededly a somewhat elastic concept," *Lujan, supra*, at 565, n. 2, the Court has referred to, or used (sometimes along with "certainly impending") other phrases such as "reasonable probability" that suggest less than absolute, or literal certainty. See *Babbitt, supra*, at 298 (plaintiff "must demonstrate a *realistic danger* of sustaining a direct injury" (emphasis added)); *Friends of the Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.*, 528 U. S. 167, 190 (2000) ("[I]t is the plaintiff's burden to establish standing by demonstrating that . . . the defendant's allegedly wrongful behavior will likely occur or continue"). See

also *Monsanto Co.* v. *Geertson Seed Farms*, 561 U. S. ___, ___ (2010) (slip op., at 11) ("""reasonable probability""" and "substantial risk"); *Davis*, 554 U. S., at 734 ("realistic and impending threat of direct injury"); *MedImmune, Inc.* v. *Genentech, Inc.*, 549 U. S. 118, 129 (2007) ("genuine threat of enforcement"); *Department of Commerce* v. *United States House of Representatives*, 525 U. S. 316, 333 (1999) ("substantially likely" (internal quotation marks omitted)); *Clinton* v. *City of New York*, 524 U. S. 417, 432 (1998) ("sufficient likelihood of economic injury"); *Pennell* v. *San Jose*, 485 U. S. 1, 8 (1988) ("realistic danger" (internal quotation marks omitted)); *Blum* v. *Yaretsky*, 457 U. S. 991, 1001 (1982) ("quite realistic" threat); *Bryant* v. *Yellen*, 447 U. S. 352, 367–368 (1980) ("likely"); *Buckley* v. *Valeo*, 424 U. S. 1, 74 (1976) (*per curiam*) ("reasonable probability"). Taken together the case law uses the word "certainly" as if it emphasizes, rather than literally defines, the immediately following term "impending."

## B

### 1

More important, the Court's holdings in standing cases show that standing exists here. The Court has often *found* standing where the occurrence of the relevant injury was far *less* certain than here. Consider a few, fairly typical, cases. Consider *Pennell, supra*. A city ordinance forbade landlords to raise the rent charged to a tenant by more than 8 percent where doing so would work an unreasonably severe hardship on that tenant. *Id.*, at 4–5. A group of landlords sought a judgment declaring the ordinance unconstitutional. The Court held that, to have standing, the landlords had to demonstrate a "'*realistic danger of sustaining a direct injury* as a result of the statute's operation.'" *Id.*, at 8 (emphasis added). It found that the landlords had done so by showing a likelihood of enforcement and a "probability," *ibid.*, that the ordinance would make

the landlords charge lower rents—even though the landlords had not shown (1) that they intended to raise the relevant rents to the point of causing unreasonably severe hardship; (2) that the tenants would challenge those increases; or (3) that the city's hearing examiners and arbitrators would find against the landlords. Here, even more so than in *Pennell*, there is a *"realistic danger"* that the relevant harm will occur.

Or, consider *Blum, supra.* A group of nursing home residents receiving Medicaid benefits challenged the constitutionality (on procedural grounds) of a regulation that permitted their nursing home to transfer them to a less desirable home. *Id.*, at 999–1000. Although a Medicaid committee had recommended transfers, Medicaid-initiated transfer had been enjoined and the nursing home itself had not threatened to transfer the plaintiffs. But the Court found "standing" because "the threat of transfers" was "not 'imaginary or speculative'" but "quite realistic," hence "sufficiently substantial." *Id.*, at 1000–1001 (quoting *Younger* v. *Harris*, 401 U. S. 37, 42 (1971)). The plaintiffs' injury here is not imaginary or speculative, but "quite realistic."

Or, consider *Davis, supra.* The plaintiff, a candidate for the United States House of Representatives, self-financed his campaigns. He challenged the constitutionality of an election law that relaxed the limits on an opponent's contributions when a self-financed candidate's spending itself exceeded certain other limits. His opponent, in fact, had decided not to take advantage of the increased contribution limits that the statute would have allowed. *Id.*, at 734. But the Court nonetheless found standing because there was a "realistic and impending threat," not a certainty, that the candidate's opponent would do so at the time the plaintiff filed the complaint. *Id.*, at 734–735. The threat facing the plaintiffs here is as "realistic and impending."

Or, consider *MedImmune, supra.* The plaintiff, a patent licensee, sought a declaratory judgment that the patent was invalid. But, the plaintiff did not face an imminent threat of suit because it continued making royalty payments to the patent holder. In explaining why the plaintiff had standing, we (1) assumed that if the plaintiff stopped making royalty payments it would have standing (despite the fact that the patent holder might not bring suit), (2) rejected the Federal Circuit's "reasonable apprehension of *imminent* suit" requirement, and (3) instead suggested that a "genuine threat of enforcement" was likely sufficient. *Id.*, at 128, 129, 132, n. 11 (internal quotation marks omitted). A "genuine threat" is present here.

Moreover, courts have often found *probabilistic* injuries sufficient to support standing. In *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.*, 438 U. S. 59 (1978), for example, the plaintiffs, a group of individuals living near a proposed nuclear powerplant, challenged the constitutionality of the Price-Anderson Act, a statute that limited the plant's liability in the case of a nuclear accident. The plaintiffs said that, without the Act, the defendants would not build a nuclear plant. And the building of the plant would harm them, in part, by emitting "non-natural radiation into [their] environment." *Id.*, at 74. The Court found standing in part due to "our generalized concern about exposure to radiation and the apprehension flowing from the *uncertainty* about the health and genetic consequences of even small emissions." *Ibid.* (emphasis added). See also *Monsanto Co.*, *supra*, at ___ (slip op., at 11–12) ("A *substantial risk* of gene flow injures respondents in several ways" (emphasis added)).

See also lower court cases, such as *Mountain States Legal Foundation* v. *Glickman*, 92 F. 3d 1228, 1234–1235 (CADC 1996) (plaintiffs attack Government decision to limit timber harvesting; standing based upon increased

*risk* of wildfires); *Natural Resources Defense Council* v. *EPA,* 464 F. 3d 1, 7 (CADC 2006) (plaintiffs attack Government decision deregulating methyl bromide; standing based upon increased lifetime *risk* of developing skin cancer); *Constellation Energy Commodities Group, Inc.* v. *FERC*, 457 F. 3d 14, 20 (CADC 2006) (standing based on increased *risk* of nonrecovery inherent in the reduction of collateral securing a debt of uncertain amount); *Sutton* v. *St. Jude Medical S. C., Inc.*, 419 F. 3d 568, 570–575 (CA6 2005) (standing based on increased *risk* of harm caused by implantation of defective medical device); *Johnson* v. *Allsteel, Inc.*, 259 F. 3d 885, 888–891 (CA7 2001) (standing based on increased *risk* that Employee Retirement Income Security Act beneficiary will not be covered due to increased amount of discretion given to ERISA administrator).

How could the law be otherwise? Suppose that a federal court faced a claim by homeowners that (allegedly) unlawful dam-building practices created a high risk that their homes would be flooded. Would the court deny them standing on the ground that the risk of flood was only 60, rather than 90, percent?

Would federal courts deny standing to a plaintiff in a diversity action who claims an anticipatory breach of contract where the future breach depends on probabilities? The defendant, say, has threatened to load wheat onto a ship bound for India despite a promise to send the wheat to the United States. No one can know for certain that this will happen. Perhaps the defendant will change his mind; perhaps the ship will turn and head for the United States. Yet, despite the uncertainty, the Constitution does not prohibit a federal court from hearing such a claim. See 23 R. Lord, Williston on Contracts §63:35 (4th ed. 2002) (plaintiff may bring an anticipatory breach suit even though the defendant's promise is one to perform in the future, it has not yet been broken, and defendant may still

retract the repudiation). *E.g., Wisconsin Power & Light Co.* v. *Century Indemnity Co.*, 130 F. 3d 787, 792–793 (CA7 1997) (plaintiff could sue insurer that disclaimed liability for all costs that would be incurred in the future *if* environmental agencies required cleanup); *Combs* v. *International Ins. Co.*, 354 F. 3d 568, 598–601 (CA6 2004) (similar).

Would federal courts deny standing to a plaintiff who seeks to enjoin as a nuisance the building of a nearby pond which, the plaintiff believes, will very likely, but not inevitably, overflow his land? See 42 Am. Jur. 2d Injunctions §§2, 5 (2010) (noting that an injunction is ordinarily preventive in character and restrains actions that have not yet been taken, but threaten injury). *E.g., Central Delta Water Agency* v. *United States*, 306 F. 3d 938, 947–950 (CA9 2002) (standing to seek injunction where method of operating dam was highly likely to severely hamper plaintiffs' ability to grow crops); *Consolidated Companies, Inc.* v. *Union Pacific R. Co.*, 499 F. 3d 382, 386 (CA5 2007) (standing to seek injunction requiring cleanup of land adjacent to plaintiff's tract because of threat that contaminants might migrate to plaintiff's tract).

Neither do ordinary declaratory judgment actions always involve the degree of certainty upon which the Court insists here. See, *e.g.*, *Maryland Casualty Co.* v. *Pacific Coal & Oil Co.*, 312 U. S. 270, 273 (1941) (insurance company could seek declaration that it need not pay claim against insured automobile driver who was in an accident even though the driver had not yet been found liable for the accident); *Aetna Life Ins. Co.* v. *Haworth*, 300 U. S. 227, 239–244 (1937) (insurance company could seek declaration that it need not pay plaintiff for disability although plaintiff had not yet sought disability payments). See also, *e.g.*, *Associated Indemnity Corp.* v. *Fairchild Industries, Inc.,* 961 F. 2d 32, 35–36 (CA2 1992) (insured could seek declaration that insurance company must pay liabil-

ity even before insured found liable).

2

In some standing cases, the Court has found that a reasonable probability of *future* injury comes accompanied with *present* injury that takes the form of reasonable efforts to mitigate the threatened effects of the future injury or to prevent it from occurring. Thus, in *Monsanto Co.*, 561 U. S., at ___ (slip op., at 11–14) plaintiffs, a group of conventional alfalfa growers, challenged an agency decision to deregulate genetically engineered alfalfa. They claimed that deregulation would harm them because their neighbors would plant the genetically engineered seed, bees would obtain pollen from the neighbors' plants, and the bees would then (harmfully) contaminate their own conventional alfalfa with the genetically modified gene. The lower courts had found a "reasonable probability" that this injury would occur. *Ibid.* (internal quotation marks omitted).

Without expressing views about that probability, we found standing because the plaintiffs would suffer present harm by trying to combat the threat. *Ibid.* The plaintiffs, for example, "would have to conduct testing to find out whether and to what extent their crops have been contaminated." *Id.*, at ___ (slip op., at 12). And they would have to take "measures to minimize the likelihood of potential contamination and to ensure an adequate supply of non-genetically-engineered alfalfa." *Ibid.* We held that these "harms, which [the plaintiffs] will suffer even if their crops are not actually infected with" the genetically modified gene, "are sufficiently concrete to satisfy the injury-in-fact prong of the constitutional standing analysis." *Id.*, at ___ (slip op., at 13).

Virtually identical circumstances are present here. Plaintiff McKay, for example, points out that, when he communicates abroad about, or in the interests of, a client

(*e.g.*, a client accused of terrorism), he must "make an assessment" whether his "client's interests would be compromised" should the Government "acquire the communications." App. to Pet. for Cert. 375a. If so, he must either forgo the communication or travel abroad. *Id.*, at 371a–372a ("I have had to take measures to protect the confidentiality of information that I believe is particularly sensitive," including "travel that is both time-consuming and expensive").

Since travel is expensive, since forgoing communication can compromise the client's interests, since McKay's assessment itself takes time and effort, this case does not differ significantly from *Monsanto.* And that is so whether we consider the plaintiffs' present necessary expenditure of time and effort as a separate concrete, particularized, imminent harm, or consider it as additional evidence that the future harm (an interception) is likely to occur. See also *Friends of the Earth, Inc.*, 528 U. S., at 183–184 (holding that plaintiffs who curtailed their recreational activities on a river due to reasonable concerns about the effect of pollutant discharges into that river had standing); *Meese* v. *Keene*, 481 U. S. 465, 475 (1987) (stating that "the need to take . . . affirmative steps to avoid the risk of harm . . . constitutes a cognizable injury").

3

The majority cannot find support in cases that use the words "certainly impending" to *deny* standing. While I do not claim to have read every standing case, I have examined quite a few, and not yet found any such case. The majority refers to *Whitmore* v. *Arkansas*, 495 U. S. 149 (1990). But in that case the Court denied standing to a prisoner who challenged the validity of a death sentence given to a *different* prisoner who refused to challenge his own sentence. The plaintiff feared that in the absence of an appeal, his fellow prisoner's death sentence would be

missing from the State's death penalty database and thereby skew the database against him, making it less likely his challenges to his own death penalty would succeed. The Court found no standing. *Id.,* at 161. But the fellow prisoner's lack of appeal would have harmed the plaintiff only if (1) the plaintiff separately obtained federal habeas relief and was then reconvicted and resentenced to death, (2) he sought review of his new sentence, and (3) during that review, his death sentence was affirmed only because it was compared to an artificially skewed database. *Id.,* at 156–157. These events seemed not very likely to occur.

In *DaimlerChrysler Corp.* v. *Cuno*, 547 U. S. 332 (2006), taxpayers challenged the constitutionality of a tax break offered by state and local governments to a car manufacturer. We found no standing. But the plaintiffs would have suffered resulting injury only if that the tax break had depleted state and local treasuries and the legislature had responded by raising their taxes. *Id.*, at 344.

In *Lujan,* the case that may come closest to supporting the majority, the Court also found no standing. But, as I pointed out, *supra*, at 11, *Lujan* is a case where the Court considered *when,* not *whether,* the threatened harm would occur. 504 U. S., at 564, n. 2. The relevant injury there consisted of a visit by environmental group's members to a project site where they would find (unlawful) environmental depredation. *Id.*, at 564. The Court pointed out that members had alleged that they would visit the project sites "soon." But it wrote that "soon" might refer to almost any time in the future. *Ibid.*, n. 2. By way of contrast, the ongoing threat of terrorism means that here the relevant interceptions will likely take place imminently, if not now.

The Court has, of course, denied standing in other cases. But they involve injuries *less* likely, not more likely, to occur than here. In a recent case, *Summers* v. *Earth Island Institute,* 555 U. S. 488 (2009), for example, the

plaintiffs challenged a regulation exempting certain tim-
ber sales from public comment and administrative appeal.
The plaintiffs claimed that the regulations injured them
by interfering with their esthetic enjoyment and recrea-
tional use of the forests.  The Court found this harm too
unlikely to occur to support standing.  *Id.,* at 496.  The
Court noted that one plaintiff had not pointed to a specific
affected forest that he would visit.  The Court concluded
that "[t]here may be a chance, but . . . *hardly a likelihood,"*
that the plaintiff's "wanderings will bring him to a parcel
about to be affected by a project unlawfully subject to the
regulations."  *Id.*, at 495 (emphasis added).

4

In sum, as the Court concedes, see *ante,* at 15–16, and
n. 5, the word "certainly" in the phrase "certainly impend-
ing" does not refer to absolute certainty.  As our case law
demonstrates, what the Constitution requires is some-
thing more akin to "reasonable probability" or "high prob-
ability."  The use of some such standard is all that is
necessary here to ensure the actual concrete injury that
the Constitution demands.  The considerations set forth in
Parts II and III, *supra*, make clear that the standard is
readily met in this case.

*          *          *

While I express no view on the merits of the plaintiffs'
constitutional claims, I do believe that at least some of the
plaintiffs have standing to make those claims.  I dissent,
with respect, from the majority's contrary conclusion.